## IN THE

# SUPREME COURT

### OF

# OREGON.

Submitted on brief without argument November 9, 1915, affirmed January 11, 1916.

## STATE ex Rel. *v.* PORT OF ASTORIA.

(154 Pac. 399.)

**Constitutional Law—Construction When Relating to Same Subject.**

1. All parts of the state Constitution, whether adopted at the same or at different times, relating to the same subject matter, must be read and construed together, the presumption being that every clause has been inserted for some useful purpose. (*Branch* v. *Albee,* 71 Or. 188 (142 Pac. 598), approved.)

**Municipal Corporations—When Constitution Should be Strictly Construed.**

2. The prime purpose in construing sections of the Constitution is to ascertain and give effect to the intention as expressed in the language used, yet where certain sections are designed to grant attributes of sovereignty to specified local subdivisions, thereby limiting the power of the legislature, it should then be strictly construed.

**Municipal Corporations—Distinction Between Municipalities.**

3. Under Article XI, Section 2, of the Constitution as amended in 1906 (adopted by the people June 4, 1906, and went into effect June 25, 1906), the legislature is prohibited from creating any corporation by a special law, but same may be formed under general laws, and the legislature is also prohibited from enacting, amending or repealing the charter or act incorporating any municipality, city or town, but the legal voters of every city and town may enact and amend their municipal charter, subject, however, to the Constitution and laws of the state. Article IV, Section 1a, of the Constitution provides that initiative and referendum powers reserved to the people are reserved to the legal voters of every municipality and district as to all municipal legislation, and the manner of exercising such powers shall be prescribed by general laws, but cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation. *Held* that the constitutional provisions are not confined in its operation to cities and towns, but that the term "muni-

79 Or.—1          (1)

cipality" includes municipal institutions other than cities and towns within the purview of the Constitution.

### Municipal Corporations—Organization and Nature of Ports.

4. Under Section 6114, L. O. L. (Laws 1909, p. 78), ports may be incorporated and permitted to exercise some of the functions of a municipal government, having power to make, modify, change or abolish rules and regulations for the use and navigation in harbors or rivers or the placing of obstructions therein, or the removal of obstructions therefrom as it may deem necessary, and such rules and regulations may be enforced by fines and penalties, any port so organized is a municipal corporation within the meaning of Article IV, Section 1a, and Article XI, Section 2, of the Constitution.

### Municipal Corporations—Intramural and Extramural Powers Defined.

5. When legal voters of a municipal corporation, enact legislation that operates only within the corporate limits, such voters are then exercising intramural authority, but when they attempt to exercise authority beyond the limits of such municipality, they are then using an extramural power.

> [As to validity of statute creating new municipality only on ratification by voters within territory affected, see note in **Ann. Cas. 1914C, 626.**]

### Municipal Corporations—Right to Exercise the Initiative and Referendum Powers.

6. Article IV, Section 1a, of the Constitution expressly empowers the legal voters of cities and towns the right and manner of exercising the initiative and referendum powers as to all local matters, and by Article XI, Section 2, they are empowered to enact and amend their own municipal charters. Subject to the Constitution and the general laws of the state, a city or town is not entitled to assume or attempt extramural authority, unless the right to exercise it has been granted by the legislature or by legislation initiated by the people of the whole state, the provisions of the Constitution only applying to intramural powers.

### Municipal Corporations — Powers of Electors to Enact and Amend Charters.

7. Under Sections 6114–6125, L. O. L., a port was incorporated, and after the amendment to Section 6121, L. O. L. (Laws 1915, p. 62), authorizing and permitting ports to acquire, charter, own and operate steamboats, vessels and other water crafts for the transportation of freight and passengers for hire, attempted to exercise the powers conferred thereby without the same having been referred to or accepted by the legal voters of the port. Article XI, Section 2, of the Constitution declares that corporations may be formed under the general law but shall not be created by special laws; that the legislature shall not enact, amend or repeal any charter or act incorporating any municipality, city or town, such authority being granted to the legal voters of every city and town, subject to the Constitution and the criminal laws of the state. Article IV, Section 1a, of the Constitution declares that the initiative and referendum powers reserved to the people are also reserved to the legal voters of every municipality and district, as to all local, special and municipal legislation, and the manner of exercising such powers shall be prescribed by general laws,

except that cities and towns may provide the manner of exercising the initiative and referendum as to their municipal legislation. *Held*, that by reason of the two constitutional provisions, the legislature, if not prevented from amending or repealing laws heretofore passed relating to any municipality, other than cities and towns, therefore a port having been established under a general law of the legislature, may exercise the powers conferred by the act amending Section 6121, L. O. L. (Laws 1915, p. 62), although the amendment was not adopted by the legal voters of such port.

From Clatsop: JAMES A. EAKIN, Judge.

In Banc.    Statement by MR. JUSTICE HARRIS.

This is a suit on the relation of C. W. Mullins, District Attorney of Clatsop County, against the Port of Astoria, a municipal corporation, and G. B. McLeod and others, commissioners of the port.

In 1909 the legislature enacted a law "to provide for incorporation under general law of ports in counties bordering upon bays or rivers navigable from the sea or containing bays or rivers navigable from the sea, and to provide for the manner of incorporating such ports and defining the powers of ports so incorporated."

The statute appears as Chapter 39 in Laws of 1909, and is codified in L. O. L., from Section 6114 to 6125, inclusive.    The purpose of the legislature is accomplished by providing for a petition, an election, a canvass of the votes, and a proclamation of the result of the election.    It is stated in Section 6120, L. O. L., that from and after the date of the proclamation made by the County Court, the territory "embraced within the limits defined in such proclamation shall be a separate district to be known as the port whose name is specified in such proclamation, and the inhabitants thereof shall be a corporation by the name and style of the port specified in such proclamation, and as such shall have perpetual succession, and by the said name shall

exercise and carry out the corporate powers and objects hereinafter conferred and declared.''

Under the terms of Section 6121, L. O. L., ''Such corporation shall have power'': (1) To improve all bays, rivers and harbors within its limits and between its limits and the sea; (2) to contract with the government of the United States to do any part of the work of making or maintaining such a depth of water as the government of the United States may from time to time determine to make or maintain; (3) to exercise the right of eminent domain in carrying on any work which the port is authorized to do; (4) to exercise control of all bays, rivers and harbors within their limits, and between their limits and the sea, with the power to make, change, or abolish wharf lines and ''to make, establish, change, modify or abolish such rules and regulations for the use or navigation in such harbors and rivers, or the placing of obstructions therein or the removal of obstructions therefrom, as it may deem convenient, requisite or necessary or in the best interests of the maritime shipping and commercial interests of the said port, and the said rules and regulations so made by it to be enforced by such fines, penalties, and punishments as it in the exercise of sound discretion may deem necessary; and the fines or penalties so imposed or levied shall be recovered in the name of said corporation in any court of this state having jurisdiction of actions for the recovery of fines and penalties imposed by state laws, and shall inure and belong to said corporation, and all punishments so imposed shall be enforced in the name of said corporation in any of the courts of this state having jurisdiction of crimes and misdemeanors under said laws''; (5) to establish, maintain and operate a tugboat and pilotage service in said port and between said port and the sea, and

to that end to purchase, lease and operate boats; (6) to acquire lands, to construct canals, and maintain and operate wharves, warehouses and drydocks; (7) to do anything which may become requisite, necessary or convenient in carrying out any of the powers granted; (8) to borrow money and issue bonds; (9) to assess, levy and collect taxes upon all property within its boundaries.

We read in Section 6122, L. O. L., that "The power and authority given to corporations organized under the provisions of this act is vested in and shall be exercised by a board of commissioners, five in number, each of whom shall be a qualified voter within the limits of said corporation."

Within ten days from the issuance of the proclamation by the County Court declaring that the legal voters have created a port, the Governor of the state appoints five commissioners, who shall serve for definite periods after which their successors are elected by the legal voters of the port.

The Port of Astoria was organized in 1910 under the general law providing for the incorporation of ports. The legislative assembly in 1915 (Laws 1915, p. 62), amended Section 6121, L. O. L., by adding the following:

"Also to acquire, charter, own, maintain and operate steamboats, power boats, vessels and water crafts for the transportation of all kinds of merchandise, passengers and freight for hire, and to engage generally in the coastwise trade and commerce both domestic and foreign and in transporting for hire all kinds of merchandise and freight.  Also to establish, operate and maintain water transportation lines in any of the navigable waters of the State of Oregon and waters tributary thereto, any portion of which may touch the boundaries of such port.  Also to own, acquire, construct, operate and maintain railroad terminal grounds

and yards, and construct, operate and maintain such line or lines of railroad, with necessary sidetrack, turnouts and switches and connection and arrangements with other common carriers, as in the judgment of the port commissioners may facilitate water commerce between such point and points within the boundaries of the port as the port commissioners may from time to time determine, all for hire, and to carry and transport freight and to move passenger trains thereon and thereover for hire. Also to engage generally in the business of buying and selling coal, fuel oil and all kinds of fuel for steamboats and power boats and power vessels of all kinds, and generally to do and cause to be done all things necessary and convenient whether herein expressed or not to successfully carry out the powers herein granted.''

After narrating the organization of the port and reciting the amendment to Section 6121, L. O. L., the complaint alleges:

That the commissioners are claiming that the amendment of 1915 enlarged the powers of the Port of Astoria so as to enable the board of commissioners to acquire and operate boats for the transportation of passengers and freight; that the legal voters of the port have never amended the charter of the port nor held an election for that purpose; that the ''Port of Astoria has properly and legally, in so far as it had the power so to do passed, adopted, and ordained resolutions and ordinances in the manner provided by its act of incorporation, to establish, maintain, own, and operate steamboats, power boats, vessels and water crafts for the transportation of all kinds of merchandise, passengers, and freight for hire, and to establish, operate, and maintain water transportation lines upon the navigable waters of the State of Oregon''; that the port has already expended over $5,000 for the purpose of establishing, operating, and maintaining water

and transportation lines, and will, unless restrained, expend ''the sum of $100,000 to purchase, own, maintain, and operate steamboats, power boats, vessels, and water crafts for the transportation of all kinds of merchandise, passengers, and freight for hire, and to establish, operate, and maintain water transportation lines in the navigable waters of the State of Oregon and waters tributary thereto.''

The complaint concludes with a prayer asking that the commissioners be restrained from acquiring or operating boats for the transportation of passengers or freight. The plaintiff declined to plead further after a demurrer to the complaint was sustained, and thereupon the court rendered a decree dismissing the suit. The appeal prosecuted by the plaintiff presents only such questions as were raised by the demurrer.

AFFIRMED.

For appellant there was a brief submitted over the names of *Mr. C. W. Mullins*, District Attorney, and *Messrs. Norblad & Hesse.*

For respondents there was a brief submitted by *Mr. George C. Fulton* and *Mr. A. C. Fulton.*

*Mr. William W. Cotton, Mr. Arthur C. Spencer, Messrs. Carey & Kerr* and *Mr. Omar C. Spencer* prepared and filed a brief *Amici Curiae.*

Mr. JUSTICE HARRIS delivered the opinion of the court.

It will be observed from the foregoing statement that the situation presented here is one where the Port of Astoria was incorporated in 1910 under a general law which was enacted in 1909, and which did not, at the time of the incorporation of the Port of Astoria, in-

clude the power to acquire and operate boats for the transportation of passengers and freight; in 1915 the general law was amended so as to add to the powers of a port, previously enumerated and defined by the act of 1909, the right to maintain boats for the transportation of freight and passengers; the legal voters of the port have never held an election to decide whether they desire to exercise the new power named by the amendment; and the commissioners are acting on the assumption that the amendment of 1915 by its own force conferred upon all existing ports adequate authority to engage in the transportation business.

On the facts narrated by the complaint, the defendants argue that the legislature possesses supervisory control over ports, and, when exercising such control, has full authority to regulate or enlarge or even to withdraw powers previously granted; that, when the legislature does speak through a general law, which in any way affects existing ports, that general law by its own compelling force immediately operates upon all existing ports; and that therefore the amendment of 1915 by its own vigor conferred upon the Port of Astoria and all other like corporations the right to operate boats for the transportation of passengers and freight. The plaintiff takes the position that the Port of Astoria is a municipality with a charter which cannot be amended by the legislature, and that therefore the port cannot engage in the transportation business until the legal voters first accept the privilege offered by the act of 1915 and incorporate the additional power into the charter by an election held for that purpose.

The difference in the conclusions reached by the litigants is traceable to the wide divergence of the opinions held by them concerning the proper construction to be placed upon Article XI, Section 2, and Article IV,

Section 1a, of the state Constitution.   The storm centers of the dispute between the parties hangs around the organic law, and on that account the two sections mentioned are here set down at length.   Article XI, Section 2, reads thus:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws.   The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town.   The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon, and the exclusive power to license, regulate, control, or to suppress or prohibit, the sale of intoxicating liquors therein is vested in such municipality; but such municipality shall within its limits be subject to the provisions of the local option law of the State of Oregon."

Article IV, Section 1a, declares that:

"The referendum may be demanded by the people against one or more items, sections, or parts of any act of the legislative assembly in the same manner in which such power may be exercised against a complete act.   The filing of a referendum petition against one or more items, sections, or parts of an act shall not delay the remainder of that act from becoming operative. The initiative and referendum powers reserved to the people by this Constitution are hereby further reserved to the legal voters of every municipality and district, as to all local, special, and municipal legislation, of every character, in or for their respective municipalities and districts.   The manner of exercising said powers shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation.   Not more than 10 per cent of the legal voters may be required to order the referendum nor more than 15 per cent to propose any measure, by the initiative, in any city or town."

1, 2. That portion of Section 2 of Article XI which deals with the liquor traffic, commencing with the words "and the exclusive power," was incorporated into the Constitution in 1910; but all that part of the section which precedes the words last quoted, as well as Article IV, Section 1a, were adopted and became effective in 1906, and, so far as they relate to the same subject matter, must be read and construed together: *McKenna* v. *City of Portland,* 52 Or. 191 (96 Pac. 552); *McMinnville* v. *Howenstine,* 56 Or. 451, 465 (109 Pac. 81, Ann. Cas. 1912C, 193); *Branch* v. *Albee,* 71 Or. 188, 197 (142 Pac. 598); *Duncan* v. *Dryer,* 71 Or. 548, 552 (143 Pac. 644); *Kalich* v. *Knapp,* 73 Or. 558, 577 (142 Pac. 594, 145 Pac. 22); *Robertson* v. *Portland,* 77 Or. 121 (149 Pac. 545, 547). As declared in *Branch* v. *Albee,* 71 Or. 188, 197 (142 Pac. 598):

"In construing a constitutional provision, the whole provision is to be examined with a view to ascertaining the meaning of every part. The presumption is that every clause has been inserted for some useful purpose, and therefore the instrument must be construed as a whole, in order that its intent and general purposes may be ascertained; and, as a necessary result of this rule, it follows that, wherever it is possible to do so, each provision must be construed so that it will harmonize with all others, without distorting the meaning of any of such provisions, to the end that the intent of the framers of the provision may be ascertained and carried out."

While the prime purpose is to ascertain and give effect to the intention as expressed in the language employed, yet the two sections now being considered are designed to grant attributes of sovereignty to specified local subdivisions, and, such grant being a limitation on the power of the legislature, it should be strictly construed as was properly held in *Thurber* v. *McMinn-*

*ville,* 63 Or. 410, 414 (128 Pac. 43) ; and this rule of construction must be applied here, notwithstanding the suggestion broached in *State* v. *Schluer,* 59 Or. 18, 27 (115 Pac. 1057), and regardless of the inference that may possibly be drawn from *Schubel* v. *Olcott,* 60 Or. 503, 515 (120 Pac. 375).

3. Prior to 1906 the legislature was granted authority to create a corporation for municipal purposes by special laws. Until that time Article XI, Section 2, read thus:

"Corporations may be formed under general laws, but shall not be created by special laws, except for municipal purposes. All laws passed pursuant to this section may be altered, amended, or repealed, but not so as to impair or destroy any vested corporate rights."

Under the present form of the organic law, however, the legislative assembly is prohibited from creating any kind of a corporation by a special law, but it has the power to provide for the formation of corporations under general laws, whether such corporations be private or public, essentially proprietary, or purely municipal, since Article XI, Section 2, opens by stating:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws."

See *Farrell* v. *Port of Columbia,* 50 Or. 169, 173 (91 Pac. 546, 93 Pac. 254) ; *Straw* v. *Harris,* 54 Or. 424, 431 (103 Pac. 777) ; *Branch* v. *Albee,* 71 Or. 188, 194 (142 Pac. 598) ; *Kalich* v. *Knapp,* 73 Or. 558, 567 (142 Pac. 594, 145 Pac. 22) ; *State ex inf.* v. *Gilbert,* 66 Or. 434, 439 (134 Pac. 1038) ; *State* v. *Hall,* 73 Or. 231, 239 (144 Pac. 475).

The first sentence of Article XI, Section 2 employs the word "corporations," and therefore that compre-

hensive term, as used in the opening sentence of that
section, includes private corporations. Both the per-
mission to provide for the formation of corporations
under general laws and the prohibition against the
legislative assembly creating them by special laws
apply to private as well as to other corporations; but,
turning to Article IV, Section 1a, it will be observed
that there private corporations are in no way referred
to. It must also be noted that Article IV, Section 1a,
speaks of "municipalities and districts," while Article
XI, Section 2, uses the terms "corporations," "mu-
nicipality, city or town," and makes no mention of
"districts." Both sections of the organic law do, how-
ever, occupy common ground when municipal corpora-
tions are considered. An analysis of the two sections
will make it reasonably clear that two classes of mu-
nicipalities are embraced: (a) Cities and towns, or
pure municipalities, as we know them in this jurisdic-
tion; and (b) all institutions which, though not cities
and towns, are nevertheless municipalities within the
purview of the Constitution. In the second sentence
of Article XI, Section 2, the legislative assembly is
prohibited from interfering with any charter or act
of incorporation for any "municipality, city or town,"
while the succeeding sentence grants the power to enact
and amend their municipal charter only to the legal
voters of every "city and town," and thus by impli-
cation denying the right to enact or amend a charter
to the legal voters of municipalities which do not rise
to the dignity of a city or town. The suggested classi-
fication of municipalities is still further emphasized by
Article IV, Section 1a; for there initiative and refer-
endum powers are reserved to the legal voters "of
every municipality and district." The manner of ex-
ercising the conferred powers "shall be prescribed by

general laws''; but ''cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation.'' The circumstance that the initiative and referendum powers are conferred upon all the legal voters of ''every municipality and district'' with permission granted to none of such municipalities or districts, except the single class of cities and towns, to prescribe their own procedure for exercising the granted powers, only accentuates the idea that this section of the Constitution embraces not only cities and towns, but also a class of institutions which are municipalities within the meaning of the organic law, although not cities and towns. If a city or town does not adopt a method of its own for the exercise of the right to initiate and refer municipal legislation, such municipality may make use of a general law enacted by the legislature; but the initiative and referendum powers lie dormant, and cannot be availed of by a municipality, which is not a city of town, except in the manner prescribed by general laws, because cities and towns are the only municipalities which are authorized to provide for the manner of exercising the powers: *McKenna* v. *Portland,* 52 Or. 191, 195 (96 Pac. 552); *Kiernan* v. *Portland,* 57 Or. 454, 459 (111 Pac. 379, 112 Pac. 402, 37 L. R. A. (N. S.) 339); *State ex rel.* v. *Kelsey,* 66 Or. 70, 78 (133 Pac. 806); *Long* v. *City of Portland,* 53 Or. 92, 96 (98 Pac. 149, 1111); *McBee* v. *Springfield,* 58 Or. 459, 462 (114 Pac. 637); *Schubel* v. *Olcott,* 60 Or. 503, 508 (120 Pac. 375); *State ex rel.* v. *Portland Ry., L. & P. Co.,* 56 Or. 32, 37 (107 Pac. 958); *Duncan* v. *Dryer,* 71 Or. 548, 552 (143 Pac. 644); *State ex inf.* v. *Gilbert,* 66 Or. 434 (134 Pac. 1038).

There is yet additional evidence that municipalities other than cities and towns are included within the

embrace of the Constitution. It is interesting to note that ever since Oregon was admitted to statehood, Article XI, Section 9, has formed a part of the state Constitution, and the language of that section recognizes the existence of municipalities other than cities and towns, for the wording is, "no county, city, town or other municipal corporation"; and it is proper to add the observation that in *Cook* v. *Portland,* 20 Or. 580, 584 (27 Pac. 263, 13 L. R. A. 533), this court, when speaking of Article XI, Section 9, declared that:

"Here is a direct interpretation from the Constitution itself. A municipal corporation is not necessarily a county, city or town."

Furthermore, the existence of the two classes of municipalities has been recognized by the judiciary, not only before 1906, but since the adoption of Article XI, Section 2, and Article IV, Section 1a, of the Constitution: *Acme Dairy Co.* v. *Astoria,* 49 Or. 520, 524 (90 Pac. 153) ; *Schubel* v. *Olcott,* 60 Or. 503, 510 (120 Pac. 375). We conclude, therefore, that the Constitution is not confined in its operation to cities and towns, but that the term "municipality" signifies more, and consequently includes institutions other than cities or towns.

4. It will now be necessary to determine whether the defendant port is a municipality within the meaning of the organic law. While we recognize the difference between a corporation organized "for municipal purposes," as was permitted by Article XI, Section 2, prior to 1906, and a pure municipality like a city, still the test for determining the existence of a municipality is as prescribed in *Cook* v. *Portland,* 20 Or. 580, 586 (27 Pac. 263, 13 L. R. A. 533), where this court held that the Port of Portland was created for municipal purposes, and that it was therefore such a corporation as the legislature could create by a special law.

"The test of a corporation for municipal purposes adopted by this court seems to have been the right or power to exercise some of the functions of government, and this we apprehend is the true test."

The legislature has accorded to ports some of the qualities of municipal corporations; for we read in the first section of Chapter 39, Laws of 1909 (Section 6114, L. O. L.), that:

"Municipal corporations designated as ports may be incorporated * * in manner as in this act hereinafter provided."

A port exercises some of the functions of government. Among the powers enumerated the port is authorized "to make, establish, change, modify or abolish such rules and regulations for the use or navigation in such harbors and rivers, or the placing of obstructions therein or the removal of obstructions therefrom, as it may deem convenient, requisite or necessary or in the best interests of the maritime shipping and commercial interests of the said port, and the * * rules and regulations so made by it to be enforced by such fines, penalties, and punishments as it in the exercise of sound discretion may deem necessary; and the fines or penalties so imposed or levied shall be recovered in the name of said corporation in any court of this state having jurisdiction of actions for the recovery of fines and penalties imposed by state laws, and shall inure and belong to said corporation, and all punishments so imposed shall be enforced in the name of said corporation in any of the courts of this state having jurisdiction of crimes and misdemeanors under said laws."

It is true that "rules" and "regulations" are the terms employed; but the mere names are not conclusive, because the thing named is described in detail, and from the description the substance is known, and

the thing called a "rule" or "regulation" is, in fact, an ordinance or a municipal law carrying a fine or penalty or punishment for a violation. It is clear, then, that a port possesses at least some of the characteristic qualities even of a pure municipality.

The act of 1909 gives further recognition to ports as municipalities by carefully providing for the operation of the initiative and referendum. It is set forth in Section 6124, L. O. L. (Section 8 of Chapter 39, Laws of 1909) thus:

"In the exercise of the initiative and referendum powers reserved under the Constitution of the State of Oregon to the legal voters of every municipality and district as to all local, special, and municipal legislation of every character in and for their respective municipalities and districts the president of the board of commissioners of said corporation shall exercise the duties of mayor of a city or town and the secretary shall perform the duties of auditor or recorder of a city or town, and the attorney of the corporation shall perform the duties of the attorney of a city or town, and if there be no attorney of said corporation then the duties required of attorney shall be performed by the secretary of such corporation."

The legislature has therefore viewed a port as a municipality: (a) By defining it to be a municipality; (b) by granting authority to exercise functions of government, to enact certain laws, and to provide fines, penalties and punishments for violations; and (c) by making provisions for the operation of the initiative and referendum powers. This court has confirmed the views of the lawmakers by classing a port with municipal corporations: *Straw* v. *Harris,* 54 Or. 424, 430 (103 Pac. 777); *State ex rel.* v. *Port of Bay City,* 64 Or. 139, 143 (129 Pac. 496); *Cook* v. *Portland,* 20 Or. 580 (27 Pac. 263, 13 L. R. A. 533); *Kiernan.* v.

*Portland,* 57 Or. 454, 466 (111 Pac. 379, 112 Pac. 402, 37 L. R. A. (N. S.) 339); *State ex rel.* v. *Swigert,* 59 Or. 132, 133 (116 Pac. 440). When speaking of the Port of Toledo in *Mackay* v. *Port of Toledo,* 77 Or. 611 (152 Pac. 250, 252), this court says:

"It must be conceded that defendant is a municipal corporation" within the meaning of Section 358, L. O. L.

5. While a port is neither a city nor a town, and although it is not necessary to attempt the solution of any problem growing out of the use of the initiative and referendum powers when exercised by cities and towns, nevertheless a survey of our own judicial utterances made concerning pure municipalities, when considered in their relation to the legislature, may afford some aid in reaching a correct decision of the instant controversy. Powers exercisable by cities and towns may be placed in two separate classes, which, for the sake of brevity and the want of better terms, will be designated as: (1) Intramural; and (2) extramural. When the legal voters of a city enact municipal legislation which operates only on themselves and for themselves, and which is confined within and extends no further than the corporate limits, then such voters are exercising intramural authority. When, however, the legal voters of a city attempt to exercise authority beyond the corporate limits of their municipality, they are using an extramural power.

6. By the plain provisions of the Constitution the legislature is prohibited from enacting, amending, or repealing a city charter by a special law. The language employed in Article XI, Section 2, has been the subject of much discussion, resulting in a contrariety of opinion as to whether the legislature possesses

79 Or.—2

authority to enact a general law when it has the effect of amending the charters of cities and towns. Even this court has not followed an unswerving course when considering the right of the legislature to enact general laws affecting the intramural powers of cities. Opinions which either hold or assume that the legislature is permitted to pass general laws regulating intramural authority appear in many adjudications: *Straw* v. *Harris,* 54 Or. 424, 437 (103 Pac. 777); *Kiernan* v. *Portland,* 57 Or. 454, 467 (111 Pac. 379, 112 Pac. 402, 37 L. R. A. (N. S.) 339); *State ex rel.* v. *Port of Tillamook,* 62 Or. 332, 341 (124 Pac. 637, Ann. Cas. 1914C, 483); *Churchill* v. *Grants Pass,* 70 Or. 283, 288 (141 Pac. 164); *State ex inf.* v. *Gilbert,* 66 Or. 434, 439 (134 Pac. 1038); *McMinnville* v. *Howenstine,* 56 Or. 451, 457 (109 Pac. 81, Ann. Cas. 1912C, 193); *State ex rel.* v. *Swigert,* 59 Or. 132, 135 (116 Pac. 440); *West Linn* v. *Tufts,* 75 Or. 304 (146 Pac. 986, 987). See, also, *California-Oregon Power Co.* v. *City of Grants Pass* (D. C.), 203 Fed. 173, 175; *Portland Ry., L. & P. Co.* v. *City of Portland* (D. C.), 210 Fed. 667, 672; and the dissenting opinions in *Kalich* v. *Knapp,* 73 Or. 558 (142 Pac. 594, 145 Pac. 22). The right of the legislature to amend municipal charters by general laws has been squarely denied in *Branch* v. *Albee,* 71 Or. 188 (142 Pac. 598); *Kalich* v. *Knapp,* 73 Or. 558 (142 Pac. 594, 145 Pac. 22); *Pearce* v. *Roseburg,* 77 Or. 195 (150 Pac. 855, 859).

The legal voters of cities and towns are not obliged to look to the legislature for the right to exercise any intramural power; but the whole sum of intramural authority is set at large, and the legal voters may exercise all of that authority or only such part of it as they may desire, subject, of course, to the Constitution and criminal laws of the state, and subject also

to the right of the people of the commonwealth to amend charters or enact supervisory legislation by the use of the initiative: *Robertson* v. *Portland,* 77 Or. 121 (149 Pac. 545, 547). Extramural authority, however, is not available to the legal voters of cities and towns, unless the right to exercise it has first been granted either by a general law enacted by the legislature or by legislation initiated by the people of the whole state. The right to employ intramural authority finds its source in the language of the Constitution, because the legal voters of cities and towns are by that instrument expressly empowered to enact and amend their own charters; but permission to employ extramural authority must be granted to cities and towns before the privilege can be exercised. One power coexists with the Constitution, while the other power does not exist at all, unless the people of the whole state either grant the authority themselves by the initiative or extend the privilege through their representative, the legislature: *Thurber* v. *McMinnville,* 63 Or. 410, 415 (128 Pac. 43); *Branch* v. *Albee,* 71 Or. 188, 205 (142 Pac. 598); *Coleman* v. *La Grande,* 73 Or. 521, 525 (144 Pac. 468); *Kalich* v. *Knapp,* 73 Or. 558, 578 (142 Pac. 594, 145 Pac. 22); *State ex rel.* v. *Port of Tillamook,* 62 Or. 332, 341 (124 Pac. 637, Ann. Cas. 1914C, 483); *Riggs* v. *Grants Pass,* 66 Or. 266, 268 (134 Pac. 776); *Couch* v. *Marvin,* 67 Or. 341, 345 (136 Pac. 6); *City of McMinnville* v. *Howenstine,* 56 Or. 451, 466 (109 Pac. 81, Ann. Cas. 1912C, 193). The opinion of Mr. Justice KING in the last-mentioned case is not in harmony with what is said here, but the reasoning of that opinion has never been followed, and is now disapproved, although a correct result was reached. Precedents have firmly established the rule that extramural power cannot be employed by cities

and towns unless a law exists permitting it, and some prior adjudications have advanced a step further, and held that a general law enacted by the legislature permitting the exercise of extramural power does not by its own force ingraft that power upon the charter of a city, but the general law may be likened to a continuous· offer of a power which nevertheless cannot be used until the legal voters of the city have accepted the offer by amending their charter so as to include the proffered power: *Riggs* v. *Grants Pass,* 66 Or. 266, 270 (134 Pac. 776); *Kalich* v. *Knapp,* 73 Or. 558, 564 (142 Pac. 594, 145 Pac. 22). While it may be *dictum,* still it would seem that there is much force in the contention that, if a city cannot exercise a given power unless permission is first granted, and if the legislature can lawfully grant that permission, then the legislature may with equal right regulate and supervise the power granted or, unless prevented by the intervention of vested rights, withdraw it entirely.

7. We have determined that a port is a municipality within the meaning of the Constitution, although it is not a city or a town, but we have yet to ascertain the relations subsisting between a port and the legislature. Ports cannot be created by the legislature by special laws (*Farrell* v. *Port of Columbia,* 50 Or. 169 (91 Pac. 546, 93 Pac. 254), but they may be formed under general laws. (*Straw* v. *Harris,* 54 Or. 424, 430 (103 Pac. 777). All corporations may be formed under general laws. All corporations cannot, however, enact or amend their own charter or acts of incorporation. Only one class of corporations is authorized to enact or amend a charter. The right of a city or town to enact or amend its charter exists only because the third sentence of Article XI, Section 2, of the Constitution creates the right; and the language which con-

fers the privilege by necessary implication excludes all other corporations. Cities and towns are not the only corporations embraced by Article XI, Section 2, because private corporations are included in the first sentence, nor are cities and towns the only municipalities mentioned in that section of the organic law. At the time of the adoption of Article XI, Section 2, municipalities other than cities and towns were in actual existence, and the very section of the organic law which accords to cities and towns the right to enact and amend their own charters also recognizes that other municipalities than cities and towns did exist, and when a particular class of municipalities, as cities and towns, was selected from municipalities in general and favored with a specified privilege, the single act of selection was of itself equivalent to saying that no other kind of municipalities could exercise the same privilege. The argument has been made and approved in at least one case that the amendment of a charter is municipal legislation within the meaning of Section 1a of Article IV, and that the right to enact municipal legislation included the right to amend a charter or act of incorporation of a port: *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145). As already noted, both sections of the organic law must be construed together. Both sections were adopted at the same time. It is plain that Article XI, Section 2, gives cities and towns power to enact or amend their own charters, while other municipalties are excluded; and, construing the two sections of the Constitution together, it cannot be said that Article IV, Section 1a, was designed to grant a power which a companion section purposely withholds. It is incongruous to assert that the power to amend is granted by Article IV, Section 1a, and prohibited by Article XI, Section 2.

Both sections of the Constitution operate with equal force; one is not more potent than the other. However, there is no conflict in the organic law. By the terms of Article IV, Section 1a, every municipality, whether it be a city or town, or whether it be a port, has the right to employ the initiative and referendum powers ''as to all local, special, and municipal legislation,'' and this means that such municipality may apply the initiative and referendum powers when enacting municipal legislation to carry out and make effective an authority previously granted. A city is chartered to improve streets, to assess the cost of the improvement against adjoining property, and to enact ordinances for carrying out the granted power. The ordinances which are enacted in the exercise of the power to improve constitute municipal legislation. It is true that amending a charter may in an enlarged sense constitute municipal legislation; but the power to enact that kind of municipal legislation is confined to cities and towns, and exists only because of Article XI, Section 2. A port is granted power to adopt rules and regulations carrying fines, penalties, and punishments, to be imposed for any violations; and when the port, in pursuance of the previously granted power, prescribes rules and regulations with fines, penalties, or punishments, it is adopting municipal legislation within the meaning of Article IV, Section 1a. All municipalities are granted the initiative and referendum powers, but none except cities and towns are favored with the privilege of providing for the manner of exercising those powers thus granted. All classes of municipalities may be formed under general laws, but none except cities and towns are favored with the privilege of enacting or amending their own charters or acts of incorporation. It seems clear then that

municipal legislation, within the meaning of Section 1a of Article IV, when applied to municipalities, other than cities and towns, refers to legislation which is permitted and made necessary for carrying into effect a lawful power previously granted. It must be remembered, too, that "municipal legislation" does not embrace every step taken or act done by a municipality. *Long* v. *City of Portland,* 53 Or. 92, 101 (98 Pac. 149, 1111). A port has no right to legislate unless that right is first created by a law; but, when the right to legislate is conferred, then Section 1a of Article IV immediately operates, and the initiative and referendum are at once made available, and the exercise of such power to legislate is municipal legislation. If it does not rise to the dignity of a city or town, a municipality cannot take unto itself and exercise any power whatever, unless the right is first granted by a law passed by the people of the whole state or by a general statute enacted by the legislature. The fact that a port cannot exercise any power at all unless permitted by some law passed by the legislature or enacted by the people of the whole state with the aid of the initiative, and the circumstance that a port is not a city or town, and therefore cannot amend its own charter or act of incorporation, lead with a compelling force to the conclusion that the legislature has ample authority to amend laws previously passed by it concerning ports. Moreover, saying that a port cannot exercise any power unless expressly permitted by the legislature or allowed by the people of the entire state, and stating that a port cannot amend its own charter or act of incorporation, when taken together, are equivalent to a declaration that the legislature possesses ample authority to adopt amendments which at once operate on all ports. The Constitution does not carry any in-

hibition against the legislature enacting general laws which regulate or even withdraw powers previously granted by that body of lawmakers to municipalities, which are not cities or towns, unless vested rights create an insurmountable obstacle. When the legislature grants a power to ports, that power is not irretrievably lost to the legislature; but the same lawmaking body may afterward by a general law regulate, add to, lessen, or even withdraw that power to the same extent as before 1906. A striking illustration of the results which would be worked out by the argument of plaintiff is furnished by the statute providing for the formation of ports. Section 6121, L. O. L., declares that:

"To the full extent which the State of Oregon might itself exercise and control or to which it can grant to corporations organized under the provisions of this act the right to exercise the same, corporations organized under the provisions of this act shall be and are hereby granted full control of all bays, rivers, and harbors within their limits, and between their limits and the sea, with full power and authority to, from time to time, make, establish, change or abolish wharf lines in such harbors and rivers."

By the terms of the statute the Port of Astoria is clothed with all the power of control over the Columbia River from that port to the sea; and yet another port may be organized farther up the river, and the second port is also armed with the same complete control over the waters of the river to the sea, so that two public bodies of exactly equal potency, and possessing powers identically the same in degree, quality and kind, are applying all their powers to the same thing, namely, the Columbia River from the Port of Astoria to the sea. Two or more ports cannot each exercise the whole sum of jurisdiction over the same thing at

the same time. It is like the meeting of two irresisti-
ble forces. If the legal voters of a port have the right
to decide whether a general law amending the powers
of ports shall apply to that port, then such legal voters
have an equal right to decide for themselves that they
will not relinquish or suffer the impairment of any
power previously granted to them; and, if they can
decline to surrender a power, they can refuse to permit
the legislature ever again to enact any legislation
which in the slightest infringes upon the previously
granted power to control the Columbia River to the
sea; and, furthermore, any power whatsoever, when
once granted to a port and accepted by it, would be
forever lost to the legislature from the very moment
of the grant. But the language of the Constitution
does not contemplate that a port, when formed under
a general law fashioned by the legislature, assumes
the shape of an *imperium in imperio*. A port is not
endowed with the quality of independence, but it is
subordinate to the legislative assembly. When the
legislature grants power to a port, that power is not
thereby irretrievably lost to the grantor, but the grant
may be increased or diminished, or even revoked if
vested rights have not intervened. The Port of As-
toria is now clothed with the powers which were added
by the act of 1915. The views herein expressed over-
rule *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac.
145).

Reducing a portion of the discussion to the form of
a recapitulation: (1) No corporation may be created
by a special law passed by the legislative assembly, but
all kinds of corporations may be formed under general
laws passed by the legislature. (2) Article XI, Sec-
tion 2, and Article IV, Section 1a, employ the term
"municipality" in a comprehensive sense, so as to in-

clude: (a) Pure municipalities like cities and towns;
and (b) all other municipalities, including ports. (3)
Cities and towns are favored with two distinct privi-
leges not awarded to any other municipality: (a) They
may enact and amend their own charters; (b) they
may prescribe their own procedure for the exercise of
the initiative and referendum. (4) Powers exercisa-
ble by cities and towns are of two classes: (a) Intra-
mural; and (b) extramural. There are precedents
holding that cities and towns are immune from inter-
ference by the legislature when exercising intramural
powers, and prior adjudications may also be found
which decide that the legislature may enact general
laws affecting the exercise of intramural powers. The
rule is now established that cities and towns cannot
use extramural powers unless first permitted to do so
by a law passed by the legislature or the people of the
whole state. (5) Article IV, Section 1a, does not em-
power a municipality to take unto itself any municipal
authority, but the language "local, special, and muni-
cipal legislation" only means that, if a power which
has been lawfully granted carries with it the right to
legislate, then that right to legislate is "municipal
legislation." This section of the Constitution does
not mean that a municipality can legislate unto itself
a power to legislate. None but a city or a town can
legislate a power unto itself without the aid of a stat-
ute, and that privilege is confined to the exercise of
intramural powers. Excluding cities and towns, all
municipalities may be controlled, supervised and regu-
lated by general laws passed by the legislature, pro-
vided such general laws do not impair the initiative
and referendum powers concerning "municipal legis-
lation," to the same extent as before 1906, when Arti-

cle XI, Section 2, and Article IV, Section 1a, became parts of the Constitution.

The decree of the Circuit Court is affirmed.

AFFIRMED.

MR. JUSTICE BEAN delivered the following dissenting opinion.

But one question is necessarily involved in this suit, viz.: What force or construction shall be given to Chapter 53 of the Laws of 1915, amending Section 6121, L. O. L.? In strict harmony with that part of Article XI, Section 2 of the Constitution which provides that "corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws," the legislature enacted Chapter 39 of the Laws of 1909 (Section 6114, L. O. L., etc.), providing for the incorporation under general law of municipalities designated as ports. The act prescribes a form of petition for an election for the organization of a port, a form for proclamation of the result, and a form for an act of incorporation, or what may be termed a charter for the municipality, when the same is adopted by the formation of a port under the provisions of the act. The law has been sustained and upheld at various times: *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777); *Bennett Trust Co.* v. *Sengstacken,* 58 Or. 333 (113 Pac. 863). This has always been done, as the writer understands, upon the theory that such general law furnishes convenient and serviceable machinery or forms to be used in the creation of ports. It does not purport to create a port, or confer any authority upon such a municipality, except by adoption thereof, by the legal voters of the district desiring to come within its provision and complying therewith; in other words, ports are purely voluntary corpora-

tions. In 1910 the Port of Astoria was organized in conformity to the directions of the act and pursuant to a general plan inaugurated and authorized by Article IV, Section 1a and Article XI, Section 2, as amended in 1906, providing for local self-government. In making this compact the people of the Port of Astoria adopted as their act of incorporation or charter the many provisions of the law of 1909 detailing the powers and privileges of ports so organized. This document then served the people of that district as their warrant of authority or charter, for all intents and purposes, as fully as though the same had been enacted for this particular port by the people of the whole state. All this was in perfect harmony with the Constitution and the statute. In 1915 the legislative assembly, in furtherance of the plain mandate of our organic law, deeming it wise to extend the provisions of the act of 1909, and provide a further plan so that ports might avail themselves of additional privileges, if the people residing therein so desired, adopted Chapter 53 of the Laws of 1915, amending Section 6121, L. O. L., by adding to subdivision 5 thereof the following:

"Also to acquire, charter, own, maintain and operate steamboats, power boats, vessels and water crafts for the transportation of all kinds of merchandise, passengers and freight for hire, and to engage generally in the coastwise trade and commerce both domestic and foreign and in transporting for hire all kinds of merchandise and freight. Also to establish, operate and maintain water transportation lines in any of the navigable waters of the State of Oregon and waters tributary thereto, any portion of which may touch the boundaries of such port. Also to own, acquire, construct, operate and maintain railroad terminal grounds and yards, and construct, operate and maintain such line or lines of railroad, with necessary

sidetrack, turnouts and switches and connection and arrangements with other common carriers, as in the judgment of the port commissioners may facilitate water commerce between such point and points within the boundaries of the port as the port commissioners may from time to time determine, all for hire and to carry and transport freight and to move passenger trains thereon and thereover for hire. Also to engage generally in the business of buying and selling coal, fuel oil and all kinds of fuel for steamboats and power boats and power vessels of all kinds, and generally to do and cause to be done all things necessary and convenient, whether herein expressed or not to successfully carry out the powers herein granted.''

This, it should be kept in mind, should be read into the act of 1909 as a part thereof. In neither of the legislative enactments is any intention evinced to make the amendment mandatory or to in any way change any act of incorporation of a port then existing. On the other hand, the general plan prescribed in the first act is carefully preserved. The constitutionality of the amendment is not and cannot be questioned: *Straw v. Harris;* 54 Or. 424 (103 Pac. 777) ; *Bennett Trust Co. v. Sengstacken,* 58 Or. 333 (113 Pac. 863). The commissioners of the Port of Astoria, however, reading this amendment, and apparently forgetting that it was merely a suggested plan to be availed of by the voters or not, as they might elect, proceeded to enforce its provisions as though it had been regularly adopted, and prepared to expend the sum of $100,000 in the purchase and operation of steamboats, power boats, vessels and water crafts, etc., without the sanction in any manner of the legal voters of the port. This suit is the result.

The position of the commissioners is not sanctioned by either the organic law or legislative enactment.

Reverting to the last section of the act of 1909, of which Section 6121, L. O. L., as amended, is now a part, we find the following declaration:

"Nothing in this act contained shall be construed as in any way altering or abridging powers now exercised or enjoyed, or by law authorized to be exercised or enjoyed by or reserved unto any such port or corporation heretofore created by and now existing under the laws of this state: Provided, however, that any such port or corporation heretofore organized and now in existence, may reincorporate under the provisions of this act."

This emphasizes the intent expressed in the general features and language of the law to the effect that it was not supposed by the lawmakers that the amendatory enactment would be taken as a charter before being adopted by the electors of a port. Nowhere in the act is it manifest that it was the legislative will that the original or amendatory act should have a retroactive effect or change the status of the existing port. If, as declared in the statute, it is necessary for a port to incorporate under and adopt as its law any part of the statute, it is just as essential that it adopt the whole, or the amendment of 1915, in the same manner. For a port to do this works no hardship; otherwise it would be possible for the legislative assembly to pass a general law for the organization of ports with little power, say 1 per cent, and after several ports were incorporated thereunder to amend the several acts of incorporation or charters by enacting a general law giving municipalities 99 per cent of the authority, without the consent of the electors of the district. In 1906 the people of the state changed their organic law and ordained as follows:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly

by special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city, or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon."

That a port is a municipality is not questioned. To give the act of 1915 the force contended for by defendants would be to hold that the legislative assembly may enact, amend or repeal the act of incorporation of the Port of Astoria. That the legislature is inhibited from changing the act of incorporation of a municipality known as a port is just as plain as that such law-making body is enjoined from enacting, amending or repealing the charter of a city or town: *Acme Dairy Co.* v. *Astoria,* 49 Or. 520 (90 Pac. 153); *Branch* v. *Albee,* 71 Or. 188 (142 Pac. 598); *City of Portland* v. *Nottingham,* 58 Or. 1 (112 Pac. 28); *Kalich* v. *Knapp,* 73 Or. 558 (142 Pac. 594, 145 Pac. 22); *McKeon* v. *City of Portland,* 61 Or. 385 (122 Pac. 291); *Pearce* v. *Roseburg,* 77 Or. 195 (150 Pac. 855); *State* v. *City of Portland,* 65 Or. 273 (133 Pac. 62). Further, as already stated, the legislative branch of the state government has not expressed a willingness to amend such an act. It has, in so far as it has the power, granted the privilege to the people of the different ports to change the law under which they exist. The port law is in the nature of an enabling act. It is analogous to our old local option liquor law, which was ineffective in any part of the state until voted upon and adopted. Article IV, Section 1a, of the Constitution is as follows:

"The initiative and referendum powers reserved to the people of this Constitution are hereby further reserved to the legal voters of every municipality and district, as to all local, special, and municipal legisla-

tion, of every character, in or for their respective municipalities and districts. The manner of exercising said powers shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation. * * "

This, as stated, was adopted at the same time as the first revision of Article XI, Section 2, and it is well settled that both should be read *in pari materia.* In *Kalich* v. *Knapp,* 73 Or. 558 (142 Pac. 594, 145 Pac. 22), Mr. Justice McNARY declared the rule to be:

"The Constitution as it is now built withholds the legislature from amending any municipal charter by legislation, be it direct or indirect, general or special, which is properly and purely the subject of municipal concern and regulation."

In *Pearce* v. *Roseburg,* 77 Or. 195 (150 Pac. 855), at page 859, the amended charter of the City of Roseburg did not limit the amount of money to be raised by taxation for the purpose of providing a sinking fund for the payment of the bonds mentioned in the amendment to the charter. Mr. Justice McBRIDE, speaking for the court, said:

"The writer * * considers it is settled in this state that as to matters purely municipal the state legislature cannot intermeddle by either general or special legislation, although as to matters affecting the people generally the power of the legislature is still unlimited, and the latter proposition cannot be maintained unless this court shall materially modify its holding in *Kalich* v. *Knapp.*"

In *Robertson* v. *City of Portland,* 77 Or. 121 (149 Pac. 545, at page 547), Mr. Justice HARRIS, speaking for the court, announced the following:

"If the electors of a municipality choose to do all things that may lawfully be done, they must manifest

that choice by their charter, and, if they are contented with the right to exercise less than the whole power, their decision is likewise written in the charter. When the legislature passed a special law amending a charter, it was deemed to be a special grant of power, and, if the voters of the entire state enact special legislation affecting a city charter, it would receive a like construction. The people of any municipality can now do that which the legislative assembly can no longer do, but at one time could do. * * The charter of a city is to its citizens and officers the measure of their authority over persons and property.''

*Riggs* v. *Grants Pass,* 66 Or. 266 (134 Pac. 776), is a case which, if followed, would be decisive of the one at hand. The city had by charter amendment authorized a bond issue of $200,000 for the purpose of building a railroad from the city to a point outside its limits. This amendment was adopted in 1912, at which time there was in existence no legislative authority from the state to exercise these extramunicipal rights. In 1913 the legislature passed an act authorizing cities to own and operate railroads running to points outside their limits; the law being general in its nature. One of the questions considered in the case was whether this act of the legislature validated the charter amendment, or in itself operated as an amendment of the city charter. Mr. Justice EAKIN, speaking for this court, stated:

''Defendants insist that the legislative act of February 27, 1913 (page 541 of the Laws of 1913), gives validity to the charter amendment of December 18, 1912; but it can have no retrospective effect. It does not operate as an amendment of city charters; but charters may be amended to take advantage of powers granted. * * The attempted amendment to the charter was unauthorized when adopted, and the legislative act could give it no vitality. Neither it nor the legislative act authorized a particular issue of bonds to

79 Or.—3

build a particular railroad or purchase any particular real estate; but before the city can have the benefit of the statute it must act affirmatively by making its charter conform to it, and then proceeding in the manner provided in its charter and ordinances."

So in *Churchill* v. *Grants Pass,* 70 Or. 283 (141 Pac. 164), the right of the same city to own and operate a railroad to a point outside its limits as mentioned in the last case was involved. It was held, in substance, that since the state had by general law given its consent to the exercise of this power, and the legal voters had determined in their charter to exercise the power, no objection could be found upon those grounds, clearly showing that two things are necessary in order to authorize a municipality to act in such matters, viz.: (1) The conferring of power; (2) the embracing of the authority within the charter or act of incorporation.

The construction of the law contended for would be repugnant to both sections of the Constitution quoted above: *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145); *Kalich* v. *Knapp,* 73 Or. 558 (142 Pac. 594, 145 Pac. 22). Overruling *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145), does not pave the way for upholding the decree of the lower court in accordance with the majority opinion. It is further necessary to eliminate from our organic law the injunction against the legislative assembly amending any "act of incorporation for any municipality." If the power to amend such a municipal document under a general law does not reside in the people of a port, then, such authority having been plainly withdrawn from the legislative assembly, resort must be had to the electorate of the whole state. This procedure does not seem to have been contemplated under the home rule scheme. Some of the difficulties encountered in the *Port of Portland Case* have been obviated by the passage of the general port law.

That case has been a guide for about eight years and cited with approval many times by this court. In the opinion of the writer, the majority opinion unsettles several other decisions in this state under which rights have been established, and suggests its own weakness in this: That after a few years its force, too, may perchance be annulled. As to this phase of the case we adopt as *apropos* the language of Mr. Justice BURNETT in his dissenting opinion in *Kalich* v. *Knapp,* 73 Or., at page 587, 145 Pac., at page 27:

"Another doctrine equally well settled is that of *stare decisis,* to the effect that, when a decision has once been rendered, it amounts to an authoritative construction of the law, and should not be disregarded or overturned, except for very cogent reasons showing beyond question that on principle it was wrongly decided. The principle is that laws are largely conventional rules of action, and it is more important that the rule be settled as a guiding precept to the public than that by the action of the courts the law should be made to fluctuate like the tides: *State* v. *Clark,* 9 Or. 466; *Multnomah County* v. *Sliker,* 10 Or. 65; *Despain* v. *Crow,* 14 Or. 404 (12 Pac. 806); *Corvallis* v. *Stock,* 12 Or. 391 (7 Pac. 524); *Sheridan* v. *Salem,* 14 Or. 328 (12 Pac. 925); *Paulson* v. *Portland,* 16 Or. 450 (19 Pac. 450, 1 L. R. A. 673); *Everding* v. *McGinn,* 23 Or. 15 (35 Pac. 178)."

Yet, in order to conform to the will of the commissioners of a port exercising their supposed functions without the sanction of the people, whom they were chosen to serve, we are asked to give a force to a statute which was never intended by the makers thereof. This would open the door for the enactment by the legislature of laws governing ports, independent of the voters of the locality affected, and compel them to bear burdens of taxation which they never voluntarily assumed—a step in return to the old system which the

people of the State of Oregon have repudiated and laid aside.

For these reasons, I am compelled to withhold my assent to the classical opinion by Mr. Justice HARRIS.